

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

CRH:EHS
F# 2022R00061

March 19, 2024

By ECF

The Honorable Peggy Kuo
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   United States v. Klaus Pflugbeil et al.
              Docket No. 24-MJ-226

Dear Judge Kuo:

      The defendant Klaus Pflugbeil (hereafter "defendant" or "Pflugbeil") is scheduled to be arraigned this afternoon before Your Honor on a criminal complaint charging him with conspiracy to transmit trade secrets. The government respectfully submits that the Court should enter a permanent order of detention because the defendant presents a serious risk of flight. The defendant is charged with a serious offense and faces a sentence of up to ten years' imprisonment. Most significantly, the defendant—a Canadian citizen and a long-time resident of the People's Republic of China (the "PRC" or "China")—has no ties to the United States, but at the same time has significant ties to foreign jurisdictions, including the PRC, where he could flee and make it unlikely for the government to extradite him for these charges. Accordingly, detention prior to trial is warranted in this case.

I.     Relevant Background[1]

    A.     The Offense Conduct

      As detailed in the Complaint and below, Pflugbeil, along with co-defendant Yilong Shao ("Shao"), a Chinese national, are operators of a PRC-based business ("Business-1") that sold technology used for the manufacture of batteries, including batteries used in electric vehicles. The defendants built Business-1 using sensitive and proprietary information belonging to Victim Company-1, a U.S-based electric vehicle company, and even marketed their business as a replacement for Victim Company-1's products. Pflugbeil sent multiple pieces of information

---

[1]     Detailed herein is a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendant. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings).

constituting Victim Company-1 trade secrets to an undercover agent posing as a potential business client, and was arrested after he traveled to the Eastern District of New York to attend a planned in-person meeting with the prospective client which, in reality, was a meeting with undercover law enforcement officers.

1. <u>Victim Company-1 and the Trade Secret Technology</u>

Victim Company-1 is a U.S.-based leading manufacturer of battery-powered electric vehicles and battery energy systems. In 2019, Victim Company-1 acquired a Canada-based manufacturer of automated, precision dispensing pumps and filling systems for use in many different industrial processes (the "Canadian Manufacturer"). These pumps are often incorporated into another product manufactured by Victim Company-1 referred to as a "battery assembly line." Companies that purchased battery assembly lines from Victim Company-1 used them to manufacture alkaline and lithium-ion batteries for consumer use. Victim Company-1's battery assembly lines are notable in the industry because of the Battery Assembly Trade Secret, which is known in the industry as "continuous motion assembly." Continuous motion assembly, a proprietary technology developed over many years by the Canadian Manufacturer, and currently owned by Victim Company-1, allows manufacturers to run battery production lines at high speed, without pausing. With the Battery Assembly Trade Secret, a battery manufacturer can produce five to ten times more parts per minute than a competitor who does not have access to the Battery Assembly Trade Secret.[2] Victim Company-1 spent millions of dollars on research and development for the Battery Assembly Trade Secret.

The precision dispensing pumps and the Battery Assembly Trade Secret are valuable and proprietary information belonging to Victim Company-1. As detailed further below, Victim Company-1 took reasonable measures to keep its designs and other information about the technology secret, including by storing the data on servers controlled by its IT department, limiting access only to certain approved employees, and maintaining agreements with customers that make clear the technology is secret and cannot be disseminated or used without Victim Company-1's authorization.

After acquiring the Canadian Manufacturer, Victim Company-1 stopped selling the pumps and battery assembly lines directly to customers. Beginning in or around 2021, Victim Company-1 signed licensing agreements with a Japanese company (the "Licensee") that authorized the Licensee to manufacture and sell the precision dispensing pumps. Only the Licensee is permitted to legally make and sell the precision dispensing pumps. No one is authorized to sell the Battery Assembly Trade Secret.

---

[2] Although some of the conduct described herein occurred before the Canadian Manufacturer was acquired by Victim Company-1, the Battery Assembly Trade Secret belongs to, and is the proprietary information of, Victim Company-1. Accordingly, unless otherwise indicated, the government uses "Victim Company-1" to refer to both the Canadian Manufacturer and Victim Company-1 even where relevant conduct occurred when the Canadian Manufacturer was an independent entity.

A.  The Defendants' Conversion of the Battery Assembly Trade Secret

The defendant has resided in the PRC since at least 2007. From approximately January 1997 until June 2009, Pflugbeil was an employee of the Canadian Manufacturer. From at least 2007 to 2009, Pflugbeil was the head of the Canadian Manufacturer's office in the PRC and was responsible for leading the company's business activity in Asia. While at the Canadian Manufacturer, Pflugbeil had access to information related to continuous motion assembly technology, including drawings and diagrams related to the Battery Assembly Trade Secret. Co-defendant Shao also worked for the Canadian Manufacturer, from approximately January 2010 to August 1, 2020, and worked for some of that time in China.

While Pflugbeil worked for the company, and continuing thereafter, the Canadian Manufacturer stored its proprietary information about the Battery Assembly Trade Secret on a server on the Canadian Manufacturer's property. The server was under the direct control of a dedicated in-house IT department. The server was separated into several drives divided by relevant business purpose. Information about the Battery Assembly Trade Secret, including drawings and diagrams related to the technology, was stored on one particular drive. Only certain approved employees were provided with access to the server containing the Battery Assembly Trade Secret. At the time that Pflugbeil was employed by the Canadian Manufacturer, he had access to the server containing the Battery Assembly Trade Secret. The Canadian Manufacturer also maintained non-disclosure agreements with customers regarding information related to the Battery Assembly Trade Secret. At least one employee of the Canadian Manufacturer during the time when Pflugbeil worked for the company has told the government that they knew that certain drawings and materials they handled, such as the information related to the Battery Assembly Trade Secret, were the company's intellectual property.

On or about October 22, 2019, the same month that Victim Company-1 purchased the Canadian Manufacturer, Shao sent Pflugbeil an email with an attachment that appears to be a business proposal about setting up a business together. Pflugbeil responded to Shao the same day, writing about "set[ting]-up" a "company" in Canada and the PRC. Pflugbeil asked Shao, "do you have the full quote from the Canada company," a reference to the Canadian Manufacturer and a sales quote for a contract with one of its customers. Pflugbeil also attached an excel document related to planning a joint venture with Shao. The next day, Shao responded to Pflugbeil by email, attaching a proposal from Victim Company-1 to a Chinese customer of Victim Company-1, as Pflugbeil appears to have requested. This proposal, dated July 3, 2019. Also attached to the email was a business plan for setting up a business to sell battery assembly products. The business plan lists Pflugbeil as the president of the new business, and Shao as the "Operations Manager."

Approximately one week later, or about October 29, 2019, Pflugbeil messaged an individual ("Individual-1") on LinkedIn: "Hey [Individual-1] anything new on [Victim Company-1]?" Individual-1 responded, "They stop selling [battery assembly] line in 1-2 years. So think about setting up your own company. No lines available around the world. No Korean. No Japanese." A few days later, on or about November 2, 2019, Pflugbeil emailed Shao, making clear that their business would be built upon Victim Company-1's trade secrets:

> Attached find the quote proposal, in a different format, so it looks very original and not like a copy. . . . Also, we need a line layout

3

and cathode system layout, it can not look like a copy, can you modify this? . . . I wanted to mentioned that I do have a lot of original documents, but of course only from before 2009, including a lot. What is our plan, do we have access to some original drawings . . . If yes, list which ones, so we can see where we have a lower risk. On this we should talk in person.[3]

(Emphasis added). The attachment to Pflugbeil's email contained a proposal for the same customer for which Shao had previously sent Pflugbeil Victim-1's proposal, as described above. As reflected above, Pflugbeil explicitly acknowledges that he took original documents with proprietary information from Victim Company-1 before he left the company in 2009. The email indicates that he was trying to cover up the fact that he had stolen Victim Company-1's trade secret by making his documents look "very original and not like a copy." The next day, November 3, 2019, Shao responded and confirmed that he had Victim-1's proprietary information related to the Battery Assembly Technology. Specifically, Shao wrote "we have all of original assembly drawings by PDF, we have some original parts drawing now, we have to make others by ourselves and get some from outside. We have all of original BOM." "BOM" is an acronym for "bill of materials," which is a list of the raw materials, sub-assemblies, intermediate assemblies, sub-components, parts, and the quantities of each material needed to manufacture an end product.

In or about July 2020, after discussing how to secure Victim Company-1 information for their own use, Pflugbeil and Shao opened a business entity that has locations in China, Canada, Germany, and Brazil ("Business-1"). Business-1 makes the same precision dispensing pumps and battery assembly lines that Victim-Company-1 manufactured. The battery assembly lines contain or utilize the Battery Assembly Trade Secret information.

B. The Transmission of Battery Assembly Trade Secret Information to the Eastern District of New York

On or about September 11, 2023, undercover agents ("UC-1," "UC-2," and "UC-3") attended a trade show for the packaging and processing industries (the "Trade Show") in Las Vegas, Nevada. UC-1, UC-2, and UC-3 posed as businesspeople who were interested in purchasing a battery assembly line from Business-1 to manufacture batteries at a facility in Long Island, New York. UC-1, UC-2, and UC-3 met Shao at the trade show. Pflugbeil was not in attendance at the Trade Show. While at the Trade Show, UC-1, UC-2, and UC-3 spoke with four representatives of Business-1. In sum and substance and relevant part, the Business-1 representatives indicated that they were interested in doing business with the undercover agents who represented themselves as businesspeople. Following the Trade Show, one of the Business-1 representatives introduced the undercover agents to Pflugbeil via email.

On or about November 17, 2023, Pflugbeil sent, via email, a detailed 66-page technical documentation proposal (the "Proposal") to UC-1 while UC-1 was in the Eastern District of New York. The Proposal notes, "this technical documentation package contains [Business-1] proprietary information which must be kept confidential." This language indicates that Pflugbeil

---

[3] Typographical errors are in the original message.

understood this information to be sensitive and valuable. In fact, rather than consisting of Business-1 proprietary information, the Proposal contained Battery Assembly Trade Secret information belonging to Victim Company-1. At least half a dozen drawings Pflugbeil used in the Proposal and sent to UC-1 were Victim Company-1's information related to the Battery Assembly Trade Secret information.

One of the drawings contained in the Proposal sent to UC-1 was a "Cathode System." The drawing is materially identical to drawing of a "Cathode System" that belongs to Victim Company-1. As discussed above, Pflugbeil previously wrote to Shao in 2019 that they needed to copy this information from Victim Company-1. Notably, the original Victim Company-1 drawing of the "Cathode System" was labeled "COMMERCIAL CONFIDENTIAL DO NOT COPY."

Another drawing contained in the Proposal sent to UC-1 was for an "AAA Combi Module." This drawing is also materially identical to a drawing belonging to Victim Company-1. The Victim Company-1 drawing was labeled "COMMERCIAL CONFIDENTIAL DO NOT COPY." The drawing in the Proposal has the exact same part numbers and description as the original Victim Company-1 drawing, except that the second digit of each part number is obscured in the Proposal version.

    C.    <u>Pflugbeil Travels to the Eastern District of New York and Attempts to Provide Battery Assembly Trade Secret Information</u>

On or about February 6, 2024, Pflugbeil agreed to come to the Eastern District of New York and meet with the undercover agents with whom he was told he would be negotiating a business deal. The stated purpose of the meeting was to finalize negotiations about the sale of battery assembly lines to be used by a business on Long Island. On or about March 18, 2024, Pflugbeil traveled to the Eastern District of New York. On or about March 19, 2024, Pflugbeil met with undercover agents in the Eastern District of New York. Pflugbeil said, in sum and substance, that (1) he and his colleagues were formerly employed by the Canadian Manufacturer; (2) the Canadian Manufacturer developed the technology; (3) when the Canadian Manufacturer was purchased by Victim Company-1, Pflugbeil hired Canadian Manufacturer employees because the Business-1 products and the Canadian Manufacturer products are "90 percent the same." Pflugbeil also told the UCs that the UCs would not need a license from the Canadian Manufacturer to use the Business-1 products in the Long Island business.

II.    <u>Legal Standard</u>

Under the Bail Reform Act, Title 18, United States Code, Section 3141, <u>et</u> <u>seq</u>., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. <u>See</u> 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of risk of flight must be supported by a preponderance of the evidence. <u>See</u> <u>United States v. Jackson</u>, 823 F.2d 4, 5 (2d Cir. 1987).

In addition, the Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g). As discussed below, these factors weigh heavily against pretrial release and in favor of pretrial detention.

III. The Statutory Factors Weigh Heavily in Favor of Detention

As set forth below, the factors to be considered in the detention analysis show that the defendant presents a significant flight risk.

First, the charged offense is serious. The defendant set up a business in the PRC to sell products that were based on stolen trade secrets and sent stolen trade secrets to UCs in the Eastern District of New York. These trade secrets were valuable—worth millions of dollars in research and development. Pflugbeil and Shao's business is based in, and the trade secrets were converted and sent from, the PRC. The theft of U.S.-owned proprietary information about the battery manufacturing process by a PRC-based company is of particular concern. Such technology is related to the development of electric vehicles that can compete with U.S.-made vehicles; as has been publicly reported, the potential for Chinese automakers to swamp the U.S. and global market with vehicles like those that can be built using this stolen technology presents a potential national security risk.[4]

Second, while the investigation is ongoing, the evidence amassed against Pflugbeil is overwhelming, including, inter alia, electronic communications between the defendants in which the defendants discussed setting up a business with stolen trade secrets and acknowledged that they had taken documents from the Canadian Manufacturer. See, e.g., United States v. Fishenko, No. 12-CR-626, 2013 WL 3934174, at *2 (E.D.N.Y. July 30, 2013) (evidence of "pertinent recorded conversations and email exchanges that reveal [the defendant's] role in the conspiracy" weighed against release). The evidence also includes (1) the stolen trade secrets sent to UC-1; (2) stolen trade secrets sent to a former vendor of the Canadian Manufacturer; (3) LinkedIn posts advertising that Business-1 was selling products of the Canadian Manufacturer; (4) direct LinkedIn messages from Pflugbeil to potential customers noting that he was selling products based on the

---

[4] See, e.g., The White House, "FACT SHEET: Biden-Harris Administration Takes Action to Address Risks of Autos from China and Other Countries of Concern" ("Connected autos that rely on technology and data systems from countries of concern, including the People's Republic of China, could be exploited in ways that threaten national security.") (available at https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/29/fact-sheet-biden-harris-administration-takes-action-to-address-risks-of-autos-from-china-and-other-countries-of-concern/); Advance Notice of Proposed Rulemaking, "Securing the Information and Communications Technology and Services Supply Chain: Connected Vehicles", Dep't. of Commerce, Bureau of Industry & Security, 89 FR 15066 (Mar. 1, 2024) (seeking comment on transactions involving information and communications technology and services related to connected vehicles, and its assessment that such transactions "could present undue or unacceptable risks to U.S. national security").

stolen trade secrets because Victim Company-1 had purchased the Canadian Manufacturer; and (5) YouTube videos advertising that Business-1 is selling the Canadian Manufacturer's pumps and spare parts.

Third, the defendant faces a significant term of incarceration should he be convicted, which provides a powerful incentive for him to flee. See, e.g., United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When the sentence . . . upon conviction is likely to be long . . . a defendant has stronger motives to flee."). The defendant currently faces a statutory maximum sentence of ten years' imprisonment. Under the United States Sentencing Guidelines, the government estimates that, assuming the defendants fall into Criminal History Category I, the guidelines sentence for the defendant is 121 to 151 months imprisonment, which would effectively be the statutory maximum sentence.[5]

Fourth, Pflugbeil has no ties to the New York area or the United States. He is a Canadian national who has resided in China for nearly two decades. It is the government's understanding that the defendant's wife and minor children live in China. If the defendant were to return to China, he would not be extradited to the United States. The defendant also appears to have significant ties to Canada and could escape the United States by driving to Canada and then flying to China.

---

[5] The government calculates this range based on an offense level of 26 (U.S.S.G. § 2B1.1(a)(2), (b)(1)(K), plus increases of two points each for (i) a substantial part of the scheme occurred outside the United States and sophisticated means were used (U.S.S.G. § 2B1.1(b)(10)); (ii) the trade secret was transmitted out of the United States (USSG § 2B1.1(b)(14)(A)), and (iii) the defendant would receive at least a two-point aggravating role adjustment (USSG § 3B1.1).

IV. <u>Conclusion</u>

        For all of these reasons, the government respectfully submits that an order of detention pending trial is necessary to ensure that the defendant returns to court.

                                        Respectfully submitted,

                                        BREON PEACE
                                        United States Attorney

                        By:    <u>/s/ Ellen H. Sise</u>
                                        Ellen H. Sise
                                        Samantha Alessi
                                        Assistant U.S. Attorneys
                                        (718) 254-7000

cc:    Clerk of Court (by ECF)
        Defense Counsel (by ECF)